IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DUSTIN HELLARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 19-CV-00043-GKF-CDL |
| | ) |
| MID CENTURY INSURANCE COMPANY | ) |
| d/b/a FARMERS INSURANCE, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

This matter comes before the court on the Motion for Summary Judgment [Doc. 90] of defendant Mid-Century Insurance Company d/b/a Farmers Insurance (Mid-Century). For the reasons set forth below, the motion is denied.

### I.     Factual Background

The following facts are undisputed for purposes of the summary judgment determination.

Mid-Century issued an Artisan Contractor Premier Policy to Gilley Ventures LLC (Gilley), designated policy no. 60184-20-49 and effective for the period from August 1, 2016 to August 1, 2017. [Doc. 90, p. 6, ¶ 1; Doc. 119, p. 8, ¶ 1]. The Policy included an Oklahoma Uninsured Motorists Coverage – Non-Stacked Endorsement, [Doc. 90-1, pp. 19-22], which stated, in part, as follows:

> We will pay, in accordance with Title 36, Oklahoma Statutes, all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle". The damages must result from "bodily injury" sustained by the "insured" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

[Doc. 90-1, p. 19].

On August 15, 2016, plaintiff Dustin Hellard was driving a Gilley-owned vehicle while in the course and scope of his employment with Gilley when a vehicle operated by an employee of Tulsa Public Schools (TPS) struck Hellard's vehicle. [Doc. 90, pp. 6-7, ¶ 2; Doc. 119, pp. 8-9, ¶ 2; Doc. 26, p. 2; Doc. 90-2]. Thereafter, Hellard presented at Hillcrest Medical Center with right-sided lower back pain and pain when he lifted his leg. [Doc. 116-1, pp. 44-45]. Hellard was diagnosed with a lumbar back sprain, given Valium and Norco, and discharged. [*Id.*].

Hellard was subsequently evaluated by Dr. Randall Hendricks of Central States Orthopedic, who initially recommended treatment with anti-inflammatories, muscle relaxants, and physical therapy [Doc. 116-1, pp. 53-54], but later, on September 21, 2016, recommended surgery. [Doc. 116-1, p. 59]. Dr. Hendricks considered Hellard temporarily and totally disabled. [Doc. 116-1, pp. 54, 59].

On October 13, 2016, Hellard underwent fusion of the L4-L5 and L5-S1 levels. [Doc. 116-2, pp. 82-84]. During the procedure, Hellard sustained a small dural tear. [*Id.*]. Although Hellard was discharged, he was readmitted to the hospital on October 17, 2016 and diagnosed with a dural leak with headache and right leg pain. [Doc. 116-2, pp. 87-88]. On October 18, 2016, Hellard underwent a partial disassembly then reassembly of the orthopedic hardware, revision laminectomy of L4 and L5 right, and dural repair. [Doc. 116-2, pp. 88-89]. On October 21, 2016, Hellard underwent another surgery that involved removal of crosslink, L5-S1 instrumentation, exploration with identification of persistent dural tear, and repair of the dural tear. [Doc. 116-2, p. 90-91]. Several months later, on March 24, 2017, Dr. Hendricks released Hellard to return to work with restrictions as of that date, and without restrictions on May 8, 2017. [Doc. 90, p. 7, ¶ 5; Doc. 119, p. 8, ¶ 1].

Hellard filed a workers' compensation proceeding against Gilley as a result of the accident. [Doc. 90, p. 7, ¶ 4; Doc. 119, p. 8, ¶ 1]. Hellard retained attorneys now associated with Smolen Law, PLLC to represent him with respect to his workers compensation claim.[1] *See generally* [Doc. 116-4]. Over the course of the workers compensation proceedings, Hellard was deposed twice. [Doc. 90, p. 7, ¶ 4; Doc. 119, p. 8, ¶ 1; Doc. 90-16].

Attorneys associated with the Smolen Firm also represented Hellard with respect to the insurance claim that is the subject of this lawsuit. All of Hellard's communications with Mid-Century during the insurance claim were through the Smolen Firm. [Doc. 90, p. 8, ¶ 7; Doc. 119, p. 8, ¶ 1].

On July 13, 2017, Hellard first notified Mid-Century of his accident via a phone call from the Smolen Firm. [Doc. 90-9, p. 19]. On July 17, 2017, the Smolen Firm faxed a letter to Mid-Century advising that Hellard would be making a claim under the UM provisions of the Policy, and requesting a copy of the Policy. [Doc. 90-11, p. 2]. The next day, on July 18, 2017, the Smolen Firm notified TPS of Hellard's intent to pursue a negligence claim against it. [Doc. 90-12].

On July 18, 2017, Mid-Century adjuster Laila Doroudian (née Oliver) telephoned the Smolen Firm regarding Hellard's claim. [Doc. 90-9, p. 11]. On July 26, 2017, Doroudian emailed the Smolen Firm a copy of the Policy and requested information as to Hellard's injury and treatment status, as well as claim information once Hellard had opened a claim with the third-party administrator for TPS. The Smolen Firm responded that Hellard was still treating and that they

---

[1] In 2017 and 2018, Laura Hamilton and Don Smolen represented Hellard as members of the law firm Smolen, Smolen & Roytman, PLLC and from 2019 to present, Mr. Smolen and Ms. Hamilton represented Hellard as a member of the law firm Smolen Law, PLLC. *See generally* [Doc. 116-4]. For ease of reference, the court refers to plaintiff's attorneys as the "Smolen Firm."

were in the process of collecting medical records. Doroudian then informed the Smolen Firm that she had the TPS adjuster's contact number, provided it, and asked for information regarding the nature of Hellard's injuries and whether he had surgery. On July 27, 2017, the Smolen Firm responded "[t]he body parts we know of are neck, back, hips and head" and "he's had back surgery." *See* [Doc. 90-13].

Over the next several months, Doroudian attempted to contact the Smolen Firm. [Doc. 90-14; Doc. 90-9, p. 5]. During a January 12, 2018 contact, the Smolen Firm advised Doroudian that Hellard was receiving treatment for his neck, back, and hips, but she did not know the nature of the treatment. [Doc. 90-9, p. 5]. Doroudian also contacted the third-party administrator for TPS, who stated that he saw a note about a $825,000 TPS policy limit but he "[wasn't] certain it was accurate." [Doc. 90-9, p. 17]. Hellard's claim was subsequently reassigned to Mid-Century adjuster Dawn Kavanaugh. [Doc. 119, p. 46]. Between January 17, 2018 and January 30, 2018, Kavanaugh contacted Gilley, Gilley's workers compensation carrier, the Smolen Firm, and TPS's third-party administrator for information regarding Hellard's claim. [Doc. 90-9, pp. 1, 8-10, 12-13, 15-16].

On January 23, 2018, Hellard filed a lawsuit against TPS related to the August 15, 2016 motor vehicle accident. [Doc. 90-20]. Neither Hellard nor his counsel informed Mid-Century of the lawsuit.

On February 6, 2018, Kavanaugh sent a letter to the Smolen Firm confirming a workers' compensation lien of approximately $93,000, and requesting any declarations pages, offers, demands, and any medical records available. [Doc. 90-21].

On May 3, 2018, Hellard's workers' compensation proceeding resolved. [Doc. 90-6, p. 2].

On May 24, 2018, Kavanaugh called the Smolen Firm regarding Hellard's insurance claim and spoke with Susan Graves who indicated she had just been transferred the file and would email Kavanaugh after she had reviewed it. [Doc. 90-9, p. 6]. That same day, Kavanaugh sent the Smolen Firm a letter, directed to Graves, requesting the status of Hellard's injury claim and whether or not Hellard had made a demand to the insurer for TPS. [Doc. 90-23].

On June 25, 2018, Kavanaugh sent Ally Harrell of the Smolen Firm a letter that stated, in part, as follows:

> It is my understanding, following our discussion of your client's claim last week the coverage available through Tulsa ISD is sufficient for compensating your client for injuries suffered in the above referenced accident and as such there is no intent to assert an underinsured motorist claim. As further evidence, the suit file and litigation ongoing at this time does not include Mid Century Insurance, as the underinsured motorist carrier.
>
> If this is accurate, we are requesting permission to move our claim to inactive status. My file will remain active for 30 days at which time we will move the file to inactive status unless we receive correspondence from you to the contrary. Thank you for your attention to this matter.

[Doc. 90-24]. Two days later, on June 27, 2018, the Smolen Firm sent the following in response:

> I hope this letter finds you well. I am writing in response to your letter dated June 25, 2018. I have spoken to Ms. Harrell, a legal secretary with our firm. Ms. Harrell never spoke to you regarding "coverage" available through Tulsa ISD because she does not work on litigation files. If she did work on those files and was privy to discussions regarding "coverage," she would know, as you should, that there is no coverage available in this matter. The Oklahoma Governmental Tort Claims Act ("OGTCA"), found at 51 O.S. section 151 *et. seq.*, clearly establishes that "any loss to any person covered by any workers' compensation act or any employer's liability act" is exempted from liability. *See* 51 O.S. section 155(14). As such, this is a straight <u>uninsured</u> motorist claim. Due to the volume of medical records arising out of this accident and your insured's medical treatment, a disk will be forthcoming that includes all medical records, relevant medical bills, tax returns, etc. A medical authorization and employment authorization will also be provided. Upon receipt of these records, I would ask that you review the claim and tender the policy limits.

[Doc. 90-25].

Subsequently, in correspondence dated July 2, 2018, the Smolen Firm provided Mid-Century copies of Hellard's medical records related to the motor vehicle accident, medical bills, tax documents, and signed medical and employment authorizations. [Doc. 90-26; Doc. 90, p. 12, ¶ 26; Doc. 119, p. 12, ¶ 26]. On August 2, 2018, Kavanaugh sent a letter to the Smolen Firm acknowledging receipt of the medical records and noting that the records were being reviewed. The letter also advised that Kavanaugh would more likely than not utilize the authorizations provided to obtain Hellard's prior medical records for spinal complaints and his employment records from Gilley. Finally, Kavanaugh requested that the Smolen Firm contact her if there were "time constraints or deadlines." [Doc. 90, p. 13, ¶ 27; Doc. 119, p. 8, ¶ 1; Doc. 90-27].

In an August 10, 2018 claim comment, Kavanaugh stated that she had reviewed the medical records and provided a brief summary of her assessment. [Doc. 90-9, p. 3].

In written correspondence to Kavanaugh dated August 15, 2018, the Smolen Firm stated, in part:

> [Y]ou have had Mr. Hellard's relevant medical bills and records now for six (6) weeks. I would emphasize that every day Farmers spends reviewing Mr. Hellard's claim is a day he must go without the UM benefits he is entitled to. I fully expect Farmers to conclude its investigation expeditiously, making every attempt to conclude this claim as quickly as possible and provide my client with the UM benefits he is due.

[Doc. 90-28, p. 2]. On August 16, 2018, Kavanaugh sent responsive correspondence to the Smolen Firm stating, in part, that she was "in the process of reviewing" the approximately 800 pages of medical records and bills forwarded in correspondence dated July 2, 2018. [Doc. 90-20, p. 1]. Kavanaugh also stated that "[e]ven though Mid Century is not currently a party to any litigation stemming from this accident, we have involved defense counsel. It has been assigned to Andrea Medley. I am sure she will be in contact with your office soon," and requested a copy of "any and all discovery, scheduling, including depositions, mediation and motion hearings ongoing in

connection with the suit." [*Id.* at pp. 1-2]. Finally, Kavanaugh notified the Smolen Firm that Mid-Century had involved coverage counsel, Greg Givens, to "review the statutes impacting Mr. Hellard's ability to collect damages under the UM/UIM coverage and/or the extent of damages recoverable under the UM/UIM coverage afforded by this policy." [*Id.*].

On October 11, 2018, Kavanaugh communicated with Gilley to obtain Hellard's prior medical and employment records. [Doc. 90-9, p. 7]. Between October 22, 2018 and November 1, 2018, Kavanaugh requested Hellard's current and past medical records from Central States Orthopedics; Rehabilitation Medicine of Oklahoma; Bailey Medical Center; Utica Park Clinic, Owasso; and Neurosurgery Specialists. [Doc. 90, p. 14, ¶ 33; Doc. 119, p. 8, ¶ 1]. Kavanaugh subsequently completed a Commercial Auto File Strategy Report for Hellard's claim, dated November 30, 2018. [Doc. 116-1, pp. 29-33].

On December 7, 2018, Andrea Medley of the Law Offices of Paul B. Middleton & Associates contacted the Smolen Firm on behalf of Mid-Century to requested that Hellard undergo an Examination Under Oath (EUO). [Doc. 90-29, pp. 1-2]. On January 15, 2019, Medley again contacted the Smolen Firm to request Mr. Hellard's EUO. [Doc. 90-29, p. 3]. Mr. Hellard did not submit to the EUO.

On January 17, 2019, Kavanaugh reviewed Hellard's Workers' Compensation files, which she had received from Mid-Century's counsel. [Doc. 90-9, pp. 20-21].

On January 29, 2019, Mid-Century extended an offer of $350,000 to Hellard for his claim, and, on March 27, 2019, sent a check for $350,000 to Hellard. [Doc. 90, p. 15, ¶ 37; Doc. 119, p. 8, ¶ 1].

A day prior to Mid-Century extending the $350,000 to Hellard, on January 28, 2019, Hellard initiated this litigation. [Doc. 2]. The Amended Complaint, the operative pleading, asserts

claims for breach of contract and breach of the implied duty of good faith and fair dealing, and seeks punitive damages. [*Id.*].

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)).

## III. Analysis

Mid-Century seeks summary judgment as to Hellard's breach of contract and breach of the implied duty of good faith and fair dealing claims, as well as Hellard's request for punitive

damages. [Doc. 90]. The court first considers Hellard's claim for breach of the implied duty of good faith and fair dealing, commonly referred to as a "bad faith claim."

    A.       Bad Faith Claim

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured and . . . the violation of this duty gives rise to an action in tort." *Christian v. Am. Home Assurance Co.,* 577 P.2d 899, 904 (Okla. 1977).[2] The essential elements of a bad faith claim are as follows: "(1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009). Tort liability requires more than mere negligence. *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005).

The Oklahoma Supreme Court has stated "a claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. The decisive question is whether the insurer had a 'good faith belief, *at the time its performance was requested*, that it had justifiable reason for withholding payment under the policy.'" *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991) (emphasis in original) (quoting *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla. 1987)). Thus, "[a] central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." *Badillo*, 121 P.3d at 1093-94. "[B]ad faith cannot exist if an insurer's conduct was

---

[2] The parties have stipulated that Oklahoma law applies to this action. [Doc. 26, p. 3].

reasonable under the circumstances." *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 170-71 (Okla. 2000); *see also Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1314 (10th Cir. 2019) ("To succeed on a bad faith claim, 'the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim."). The insurer's conduct must be assessed based on the facts known and knowable to the insurer concerning the claim at the time the insurer's performance was requested. *Buzzard v. McDanel*, 736 P.2d 157, 159 (Okla. 1987); *see also Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1439 (10th Cir. 1993).

"The mere allegation that an insurer breached the duty of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination." *Oulds,* 6 F.3d at 1436. "Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed." *Id.* at 1437; *see also Garnett v. Gov't Emps. Ins. Co.,* 186 P.3d 935, 944 (Okla. 2008) ("Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious.").

Mid-Century argues that the existence of a legitimate dispute as to Hellard's injuries and damages precludes bad faith liability. Under Oklahoma law, "[a] [bad faith] cause of action will not lie where there is a legitimate dispute." *Newport v. USAA*, 11 P.3d 190, 195 (Okla. 2000) (quoting *Manis v. Hartford Fire Ins. Co.*, 681 P.2d 760, 762 (Okla. 1984)).

However, the Tenth Circuit, applying Oklahoma law, has recognized that "a legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith."

*Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995). Rather, even where a legitimate dispute exists, a jury must still determine the existence of bad faith when the insured "produce[s] additional evidence of bad faith." *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128 (10th Cir. 2012) (quoting *Timberlake,* 71 F.3d at 344); *see also Shotts*, 943 F.3d at 1315. The Tenth Circuit has recognized that the additional evidence may take several forms, including "evidence that the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage, denied the claim for an illegitimate reason, or otherwise failed to treat the insured fairly." *Shotts*, 943 F.3d at 1315 (internal quotations and citations omitted) (emphasis in original).

Additional evidence of bad faith may also include evidence "that the insurer performed an inadequate investigation of the claim." *See Shotts*, 943 F.3d at 1315; *Bannister,* 692 F.3d at 1128 (quoting *Timberlake Constr. Co.*, 71 F.3d at 345) ("Another instance in which the jury may decide the issue is if there is evidence that the insurer 'failed to adequately investigate [the] claim.'"). "[W]hen a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information." *Timberlake Constr. Co.*, 71 F.3d at 345.

Viewing the evidence in the light most favorable to Hellard and drawing all reasonable inferences in his favor, as the court must, the court concludes that plaintiff submits evidence from which a reasonable juror could conclude that Mid-Century's handling of Hellard's insurance claim was tortious.[3] Specifically, reasonable minds could differ as to whether Mid-Century acted in

---

[3] In the argument section of his response brief, Hellard cites to the report of Richard N. Cary, a claims handling expert, and Hellard has provided the court Cary's report as Plaintiff's Exhibit 7. *See* [Doc. 116-8]. On August 31, 2020, Mid-Century filed a *Daubert* Motion to Exclude the Testimony of Plaintiff's Expert Richard Cary. [Doc. 92]. In light of the pending motion to exclude, the court notes that it did not consider Mr. Cary's expert report in determining the motion for summary judgment.

good faith in connection with its investigation of Hellard's UM claim and whether Mid-Century made reasonably prompt determinations of Hellard's entitlement to UM benefits after demand. Although the record as a whole demonstrates that genuine disputes of material fact exist as to the reasonableness of Mid-Century's conduct, the court specifically notes the following: Mid-Century evaluated Hellard's claim based on Hellard having had a one-level fusion, when Hellard, in fact, underwent a two-level fusion. *See* [Doc. 90-9, p. 3; Doc. 116-3, pp. 167:1 to 168:10]. Kavanaugh failed to discuss the potential for future medical and evaluated the category at $0 in the "Exposure Evaluation" section of her November 30, 2018 Commercial Auto File Strategy Report, although Hellard had submitted evidence that Kris Parchuri, D.O. of Spine and Orthopedic Specialists recommended an anterior cervical discectomy, decompression, and fusion of C5-C6 in May of 2018 [Doc. 116-1, pp. 29-33; Doc. 116-2, pp. 60-64]. Finally, on more than one occasion during her handling of the claim, Kavanaugh expressed her intent to take additional action but either failed to do so or delayed action for weeks or even months. *See, e.g.,* [Doc. 116-1, pp. 24, 32; Doc. 119, pp. 38, 55].[4] Because genuine disputes of fact exist as to the reasonableness of Mid-Century's claims handling, a jury must determine the existence of bad faith. Mid-Century's motion for summary judgment as to Hellard's breach of the implied duty of good faith and fair dealing claim is denied.

B. *Punitive Damages*

Mid-Century next seeks summary judgment as to Hellard's request for punitive damages. Mid-Century argues that Hellard cannot establish that Mid-Century recklessly disregarded its duty of good faith and fair dealing.

---

[4] Nothing herein is intended to limit the evidence that may be offered at trial with respect to Mr. Hellard's bad faith claim.

Under Oklahoma law, an award of punitive damages is appropriate where the jury finds by clear and convincing evidence that "[a]n insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured" or "intentionally and with malice breached its duty to deal fairly and act in good faith with its insured." Okla. Stat. tit. 23, § 9.1(B)(2), (C)(2).[5] If the jury finds that the insurer acted with "reckless disregard," the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award damages in an amount not to exceed the greater of: (a) one hundred thousand dollars ($100,000.00), or (b) the amount of the actual damages awarded. Okla. Stat. tit. 23, § 9.1(B)(2). Alternatively, if the jury finds that the insurer acted intentionally and with malice, the jury, in a separate proceeding after the award of actual damages, the jury may award punitive damages in an amount not to exceed the greatest of: (a) five hundred thousand dollars ($500,000.00), (b) twice the amount of actual damages awarded, or (c) the increased financial benefit derived by the insurer as a direct result of the conduct causing the injury to the plaintiff and other persons or entities. Okla. Stat. tit. 23, § 9.1(C)(2). However, as recognized by the Oklahoma Supreme Court

> Although the current punitive damage statute contains language specifically referencing insurers when they are sued for breach of the duty of good faith and fair dealing, our recognition in *Buzzard* that such an award is not automatic and is governed by the standard applicable in other tort cases still stands and nothing in § 9.1 has altered this principle.

*Badillo*, 121 P.3d at 1106. Thus, for punitive damages to be allowed there must be evidence, at a minimum, from which a reasonable juror could conclude that

> [Defendant] was either aware, or did not care, that there was a substantial and unnecessary risk that [its] conduct would cause serious injury to others. In order for the conduct to be in reckless disregard of another's rights, it must have been

---

[5] Hellard does not argue that Mid-Century "engaged in conduct life-threatening to humans." *See* Okla. Stat. tit. 23, § 9.1(D)(2).

unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to another person.

Okla. Unif. Jury Instruction 5.6

Viewing the summary judgment record in the light most favorable to Hellard and drawing all reasonable inferences in his favor, a genuine issue of fact exists as to whether Mid-Century, at a minimum, recklessly disregarded its duty of good faith and fair dealing with respect to its obligation to conduct a reasonable investigation and make timely payment of Hellard's claim. Summary adjudication of the punitive damages issue is therefore not warranted at this time.

### C. Breach of Contract

Finally, Mid-Century argues it is entitled to summary judgment as to Hellard's breach of contract claim.

In Oklahoma, general principles of contractual interpretation govern the construction of an insurance policy. *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991). Under Oklahoma law, the elements of a breach of contract claim are: "(1) the formation of a contract, (2) breach of the contract, and (3) damages as a result of that breach." *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018).

The Policy obligates Mid-Century to pay "all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured motor vehicle,'" provided that the damages "result from 'bodily injury' sustained by the 'insured' caused by an 'accident.'" [Doc. 90-1, p. 19]. Mid-Century argues that it is entitled to summary judgment because it has tendered $350,000.00 to Hellard, which exceeds the amount of Hellard's "medical incurred" and "lost wages." Further, Hellard testified he has no outstanding medical bills.

However, as stated above, Hellard submits evidence that Mid-Century evaluated his claim on the basis of a one-level fusion, rather than two-level fusion, and Kavanaugh testified that the

average settlement would probably be higher for a two-level fusion. [Doc. 90-9, p. 3; Doc. 119 p. 167:1-24]. Hellard also submits evidence from which a reasonable juror could conclude that Mid-Century failed to include future medical expenses for which evidence was provided in its evaluation of his claim. [Doc. 116-1, pp. 29-33; Doc. 116-2, pp. 60-64]. Further, evidence exists from which reasonable minds could differ as to whether Mid-Century adequately compensated Hellard for his physical and mental pain and suffering. *See* [Doc. 90-33, p. 4 (noting that Hellard is seeking such damages); Doc. 116-5, pp. 94:7 to 95:3]. Thus, a genuine dispute of fact exists as to whether Mid-Century has paid Hellard all sums he is legally entitled to recover as compensatory damages resulting from bodily injury sustained in the August 15, 2016 motor vehicle accident. Mid-Century's motion for summary judgment as to the contractual claim is denied.

## IV.  Conclusion

WHEREFORE, the Motion for Summary Judgment [Doc. 90] of defendant Mid-Century Insurance Company d/b/a Farmers Insurance is denied.

DATED this 10th day of November, 2020.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE